**IT IS ORDERED as set forth below:**

Date: February 21, 2025



_____Susan D. Barrett_____
United States Bankruptcy Judge
Southern District of Georgia

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE
## SOUTHERN DISTRICT OF GEORGIA
### Augusta Division

| | | |
|---|---|---|
| IN RE: | ) | Chapter 13 Case |
| | ) | Number 22-10534 |
| JOHN LOUIS SAMPSON, | ) | |
|     Debtor. | ) | |
| | ) | |
| | ) | |
| JOHN LOUIS SAMPSON, | ) | |
|     Plaintiff. | ) | |
| | ) | Adversary Proceeding |
| v. | ) | Number 23-01004 |
| | ) | |
| THE ESTATE OF RICHARD INGLETT, | ) | |
|     Defendant. | ) | |
| | ) | |

### OPINION AND ORDER IN ADVERSARY PROCEEDING AND ORDER ON MOTION FOR ANNULMENT OF THE AUTOMATIC STAY

Before the Court is John Louis Sampson's ("Mr. Sampson's") complaint to hold the Estate of Richard Inglett ("Inglett") in contempt for violating the 11 U.S.C. §362[1] stay and for damages

---

[1] Unless otherwise expressly noted, all statutory references are to Title 11 of the United States Code.

1

relating thereto and Inglett's request for the Court to annul the §362 stay and validate the foreclosure. (Dckt. No. 2; Third Case (as defined below), Dckt. No. 47). These are core proceedings pursuant to 28 U.S.C. §157(b)(2)(A) and (G), and the Court has jurisdiction to consider the matters under 28 U.S.C. §1334. After considering the arguments and evidence submitted at trial, and for the reasons set forth on the record at the conclusion of the trial and herein, the Court denies Mr. Sampson's request to find Inglett in contempt, denies Mr. Sampson's request for damages, denies Mr. Sampson's request to unwind the sale, and grants Inglett's request to annul the stay and to validate the foreclosure sale.

## FINDINGS OF FACT

The parties stipulated to the following facts:[2]

1. By virtue of that certain Deed to Secure Debt and Promissory Note in favor of the defendant [] with regards to certain real property located at 3663 Wrightsboro Road, Richmond County, Georgia 30909 ("Property"), [Inglett] was the holder of a secured claim against [Mr. Sampson] with the Property securing such claim.

2. On April 25, 2018, Mr. Sampson in the above referenced bankruptcy proceeding, filed a Chapter 13 bankruptcy in this Court (Case Number 18-10588) ("First Case").

3. On July 14, 2020, the First Case was dismissed for Mr. Sampson's failure to comply with a court order dated November 14, 2019. (Dckt. [N]o. 57, First Case.).

4. On January 4, 2021, Mr. Sampson filed another Chapter 13 bankruptcy in this Court (Case Number 21-10003) ("Second Case").

5. Mr. Sampson's voluntary petition[s] for First Case and Second Case list[] his residence address as the Property.

---

[2] The parties submitted an Amended Consolidated Pre-Trial Order ("Amended Pre-Trial Order") in advance of trial, which includes the parties' joint stipulated facts as Attachment A. Dckt. No. 72. The Court orally addressed the Amended Pre-Trial Order with the parties before commencing the trial and enters the Amended Pre-Trial Order contemporaneously herewith to memorialize those final terms. Case No. 23-01004, Dckt. No. 86.

2

6. On March 5, 2021, [Inglett's] real estate agent and property manager, Sandra Smith [("Ms. Smith")], filed a proof of claim, POC 6-1, which stated that notices and payments should be mailed to [Inglett] at 525 10th Avenue South, Jacksonville, Florida 3225[0, Harlem, GA 30814-3081].

7. On June 21, 2021, [Inglett's] counsel amended POC 6 ("Amended POC 6").

8. Amended POC 6 correctly identifies that (1) bankruptcy notices and payments should be mailed to 525 10th Avenue South, Jacksonville, Florida 32250, and (2) [Inglett's] counsel is the attorney for [Inglett] and the Court's ECF notifications regarding Second Case should be emailed to [Inglett's] counsel at bak@klosinski.com.

9. After the filing of Amended POC 6, [Inglett] proceeded to file a motion for relief for [Mr. Sampson's] failure to make post-petition mortgage payments to [Inglett], and failure to maintain property insurance. (Dckt. [N]o. 58, Second Case.).

10. Thereafter, a strict compliance Amended Order [("Strict Compliance Order")] on [Inglett]'s motion for relief was entered in Second Case on August 4, 2021. (Dckt. [N]o. 70, Second Case.).

11. Said order required Mr. Sampson to cure the post-petition arrearage owed to [Inglett], remain current on mortgage payments owed to [Inglett], and maintain insurance coverage on the Property. Said order was consented to by [Inglett]'s counsel, the attorney for Mr. Sampson, and the Chapter 13 Trustee.

12. On March 28, 2022, [Inglett] filed an affidavit of default claiming that Mr. Sampson has defaulted under the terms of said order. (Dckt. [N]o. 77, Second Case.[).]

13. Thereafter on April 20, 2022, this Court entered an order granting [Inglett] relief from the automatic stay. (Dckt. [N]o. 78, Second Case.[).]

14. [Inglett]'s counsel attempted to initiate foreclosure on the Property beginning in June 2022 for a knock off of the Property to occur on the first Tuesday of July 2022.

15. The notice of sale of Property did not run through the month of June 2022.

16. [Inglett]'s counsel then initiated foreclosure of the Property at the beginning of July 2022, by providing proper notice and advertising a notice of sale for the Property through the month of July 2022.

3

17. On July 20, 2022, the Chapter 13 Trustee filed a motion to dismiss the Second Case, due to Mr. Sampson's failure to make Chapter 13 Plan payments. (Dckt. [N]o. 84, Second Case.[).]

18. On July 28, 2022, this Court entered an order dismissing Mr. Sampson's Second Case [for failure to make plan payments]. (Dckt. [N]o. 86, Second Case.)

19. On July 29, 2022, Mr. Sampson filed his third Chapter 13 Bankruptcy case in this Court (Case Number 22-10534) ("Third Case").

20. Mr. Sampson's voluntary petition in Third Case lists his residence as 908 Bennock Mill Road, Richmond County, Georgia 30906 and his mailing address as the Property. (Dckt. [N]o. 1, Third Case.[).]

21. In Mr. Sampson's Schedule D of Third Case, Mr. Sampson lists [Inglett] as a secured creditor with the Property securing such claim. The mailing address listed for [Inglett] on Schedule D is 928 Louisville Road, Harlem, Georgia 30814 ("Harlem Address").

22. [The] Harlem Address is [Inglett]'s former mailing address. Columbia County GIS shows that [Inglett] sold the Harlem Address on November 27, 2017.

23. On August 1, 2022, Mr. Sampson filed a motion to extend the automatic stay, with an accompanying certificate of service that states that said motion was only served on the Chapter 13 Trustee. (Dckt. [N]o. 6, Third Case.) [The notice of hearing incorporating the terms of the motion to extend the automatic stay was served upon the entire creditor matrix, using the Harlem Address for Inglett's address.][3]

24. On August 2, 2022, [Inglett]'s counsel proceeded to knock off the Property on the Court house [sic] steps of Richmond County, Georgia. No bids were made on the Property other than [Inglett]'s initial bid of $170,000.00.

25. As of the date of the public auction of the Property, the total amount owed to [Inglett] was $279,832.54, plus reasonable attorney's fees.

26. On August 12, 2022, Mr. Sampson filed a Chapter 13 Plan, [D]ckt. [N]o. 15, Third Case, listing [Inglett] under paragraph 3(d) [sic] as a prepetition arrearage claim to be cured.

---

[3] The parties did not stipulate to this bracketed sentence; however, it is undisputed, and the Court makes this finding of fact.

4

27. On August 17, 2022, this Court entered an Order extending the automatic stay. (Dckt. [N]o. 17, Third Case.[).]

28. On August 18, 2022, the Honorable Judge John Flythe of Richmond County Superior Court signed a Report of Sale of the Property.

29. On September 1, 2022, a deed under power conveying Property to [Inglett] was recorded in the Office of the Clerk of Superior Court of Richmond County, Georgia in Deed Book 1857, Page 1027.

30. After the recording of the deed under power, [Inglett], through [Inglett]'s real estate agent, proceeded to market the Property for sale online and by placing a for sale sign on the Property.

31. On November 10, 2022, [Inglett] sold the Property to a third party [("Third Party")] for $250,000.00 and signed a warranty deed evidencing such sale.

32. At the closing of the Property, [Inglett] paid $18,438.56 to the Richmond County tax commissioner for Mr. Sampson's unpaid property tax liability from 2018 to 2022.

33. [Inglett]'s net return from the sale of the Property was $215,251.48.

Dckt. No. 86, Attach. A.

At the trial, Mr. Sampson testified that after he filed his Third Case he tried to make a payment to Inglett's representative and show Inglett's representative evidence of the filing of his Third Case. He testified that Inglett's representative would not allow him to make the payment or accept the paperwork because Inglett had already foreclosed upon the Property. He acknowledged he never physically provided a copy of the notice of his Third Case to Inglett's representative. At a previous hearing, Mr. Sampson indicated that this meeting may have taken place on August 15, 2022, Dckt. No. 56 Ex. A, Tr. 24:6–24:8;[4] however, at trial Mr. Sampson was uncertain of the exact

---

[4] This date is post-petition and after the foreclosure but before the sale to the Third Party.

date. The exhibits Mr. Sampson tendered into evidence at trial indicate this conversation occurred on September 15 or 16, 2022. Pl. Ex. C (voice recording of an exchange in which Mr. Sampson attempts to make a payment, and he memorializes the date as September 15); Pl. Ex. D (text message from Ms. Smith dated September 16: "your attorney can get the foreclosure deed from the courthouse."). The foreclosure was held on August 2, 2022, and the Deed Under Power conveying the Property to Inglett was recorded on September 1, 2022, before these exchanges. Dckt. No. 86, Attach. A ¶¶24, 29.

At trial, Ms. Smith testified that Inglett hired her in 2017 to collect mortgage payments on the Property. This is before Mr. Sampson filed the First Case. Ms. Smith has been a legal secretary for a real estate attorney for thirty years and a realtor for eighteen years. She testified that she knows that a bankruptcy filing "stops everything." She testified that she first became aware Mr. Sampson had filed the Third Case when Inglett's counsel informed her of the filing. Pleadings filed by Inglett's counsel indicate he first became aware of the filing of the Third Case on December 14, 2022, after both the foreclosure and the sale to the Third Party had been completed.[5] Third Case, Dckt. No. 47. Inglett filed the Motion for Relief on December 19, 2022, shortly after Inglett's counsel says he received notice of the filing of the Third Case. Third Case, Dckt. No. 47.

## CONCLUSIONS OF LAW

The issue before the Court is whether Inglett should be held in contempt for violating the automatic stay by foreclosing and selling the Property post-petition; or, whether Inglett is entitled to have the stay annulled and the foreclosure validated. For the reasons cited in this Order, and

---

[5] The foreclosure occurred August 2, 2022, and the Property was sold to the Third Party on November 10, 2022. Dckt. No. 86, Attach. A ¶¶24, 31.

those stated on the record at the conclusion of the trial, the Court denies Mr. Sampson's request to find Inglett in contempt and grants Inglett's motion to annul the stay and validate the foreclosure sale.

The automatic stay provides debtors with broad protections against acts to collect or enforce a debt. §362(a)(1). Once the bankruptcy is filed, the stay is designed to stop "any act to collect, assess, or recover" a claim against the debtor that arose before the commencement of the bankruptcy. §362(a)(6). Section 362(a) states in relevant part:

> (a) [A] [bankruptcy] petition . . . operates as a stay, applicable to all entities, of—
>
> > (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;
> > . . .
> > (6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title . . .

§362(a)(1), (6). In the Eleventh Circuit "[a]cts taken after the stay is in place are generally deemed void and without effect." Albany Partners, Ltd. v. Westbrook (In re Albany Partners), 749 F.2d 670, 675 (11th Cir. 1984). It is undisputed that Inglett foreclosed on the Property post-petition and proceeded to sell it to the Third Party thereafter. In appropriate circumstances, §362(d) expressly authorizes the Court to grant relief from the stay by "terminating, annulling, modifying, or conditioning" it for cause. §362(d) (emphasis added). "[Section] 362(d) expressly grants bankruptcy courts the option, in fashioning appropriate relief, of 'annulling' the automatic stay, in addition to merely 'terminating' it." In re Albany Partners, 749 F.2d at 675. The determination to

7

annul the stay to provide retroactive relief should only be granted in limited circumstances and determined on a case-by-case basis. See id.; In re Barr, 318 B.R. 592, 598 (Bankr. M.D. Fla. 2004).

Non-exclusive factors to consider when determining whether to annul the stay include: (1) whether the creditor was aware of the bankruptcy when they conducted the foreclosure; (2) whether the debtor acted in bad faith; (3) whether grounds existed for modifying the stay if the motion had been filed prior to the stay violation; (4) whether denial of the request for retroactive relief would result in unnecessary expense; and (5) whether the creditor has detrimentally changed its position on the basis of the action it has taken. 318 B.R. at 598. In cases where a creditor seeks to annul the stay to validate a post-petition foreclosure sale, courts have also considered: (a) whether there is equity in the property of the estate; (b) whether the property is necessary for an effective reorganization; (c) whether the creditor promptly sought to lift the stay retroactively to obtain approval of the sale; and (d) the intervening rights of a third-party purchaser. In re Potchen, No. 6:22-bk-1156-TPG, 2022 WL 4690322, at *5 (Bankr. M.D. Fla. Sept. 30, 2022) (citing In re Batton, 308 B.R. 406, 410 (Bankr. W.D. Mo. 2004)).

In this case, it is undisputed that Inglett did not have notice of the bankruptcy at the time of the foreclosure. The initial notice did not go to the proper address, and Mr. Sampson does not claim Inglett knew of the Third Case at the time of the foreclosure. Furthermore, after considering the evidence, the Court finds Inglett did not have notice of the Third Case when the Property was sold to the Third Party. Ms. Smith clearly testified she did not have notice of the Third Case at the time of the foreclosure or when the Property was sold to the Third Party. After considering the facts and evidence, the Court does not find it credible that Ms. Smith would have proceeded with the sale in the face of a pending bankruptcy. Inglett, Ms. Smith, and Inglett's counsel have been active in Mr.

8

Sampson's previous bankruptcy cases, and given the collective facts of these cases, along with the undisputed fact that Inglett did not have notice of the Third Case at the time of the foreclosure, the Court finds it improbable that Ms. Smith or Inglett would not have requested relief from the stay prior to selling the Property to the Third Party had they known of the Third Case. Furthermore, Mr. Sampson has the burden of proof to establish that the stay should not be annulled, and he failed to satisfy this burden. See §362(g) ("In any hearing under subsection (d) or (e) of this section concerning relief from the stay of any act under subsection (a) of this section—(1) the party requesting such relief has the burden of proof on the issue of the debtor's equity in property; and (2) the party opposing such relief has the burden of proof on all other issues.");[6] In re Evans, 665 B.R. 670, 681 (Bankr. N.D. Ga. 2024) ("Consistent with § 362(g), the creditor seeking retroactive relief must first show the presence of circumstances warranting annulment of the stay, and the debtor then bears the ultimate burden of proving that the request for retroactive relief from the stay should be denied.") (internal citations omitted). For these reasons, the Court finds that Mr. Sampson has not carried his burden to show that Inglett was on notice of the Third Case before the foreclosure or the sale to the Third Party.

Another consideration is whether grounds existed for granting relief from the stay had the motion been filed prior to the stay violation. As to this factor, the Court finds there undoubtedly are grounds for granting relief. Mr. Sampson's First Case was dismissed in 2020 for his failure to make payments as provided in a strict compliance order. First Case, Dckt. Nos. 54, 56–57. Mr. Sampson filed his Second Case less than six months after the dismissal of the First Case. Second Case, Dckt.

---

[6] As discussed hereafter, there is no equity in the Property.

No. 1.  In the Second Case, Inglett filed a motion for relief asserting Mr. Sampson had only made one post-petition payment and failed to maintain insurance on the Property.[7]  Second Case, Dckt. No. 58 ¶¶4–7.  The parties submitted, and the Court entered, a Strict Compliance Order providing that relief would be granted if Mr. Sampson failed to produce and maintain insurance on the Property, timely cure his post-petition default to Inglett, and timely make further payments to Inglett.  Second Case, Dckt. No. 70.  Thereafter, Inglett filed an affidavit of default.  Second Case, Dckt. No. 77.  Mr. Sampson did not respond to the affidavit of default, and in accordance with the terms of the strict compliance order, relief was granted.  Second Case, Dckt. No. 78.  After obtaining relief from the stay in the Second Case, Inglett commenced foreclosure proceedings.  Also, after the order for relief was entered, the Second Case was dismissed, with Mr. Sampson's written consent, for his failure to make plan payments.  Second Case, Dckt. Nos. 84–86.  The day after the dismissal, Mr. Sampson filed his Third Case, the Friday before the Tuesday foreclosure date.  Given these facts, relief from stay would have been granted.

Under §362(g)(1), Inglett has the burden of proof on the issue of debtor's equity in the Property.  Mr. Sampson's bankruptcy schedules show no equity in the Property.  Third Case, Dckt. No. 26.  Furthermore, it is clear from the schedules and testimony that Mr. Sampson does not reside at the Property.  Id.  He said he operated his business from the Property but testified it only has a small shed and that the Property is uninsurable.  While important, the Property is not necessary for Mr. Sampson's reorganization.  He has failed to maintain insurance on the Property and failed to

---

[7]   At the trial, Mr. Sampson provided conflicting information as to insurance.  He testified there was a small shed on the Property but also said the Property could not be insured because there were no buildings on the Property.  However, he did not raise this as a defense to the affidavit of default.

10

timely pay five years of ad valorem property taxes.[8]  Mr. Sampson has a long history of not making timely payments to Inglett or to the Chapter 13 Trustee.  Inglett has participated in all three of Mr. Sampson's bankruptcies over the course of seven years.  Mr. Sampson has been unsuccessful in fulfilling his obligations to Inglett, and given the facts and circumstances of this case, grounds certainly existed for granting relief from the stay if the motion had been filed before the foreclosure.

Next, the Court turns to the issue of whether Mr. Sampson filed this case in bad faith.  If a debtor has had one prior chapter 13 case pending within the twelve-month period prior to filing the current case, there is a presumption that the current case is filed in bad faith and the automatic say terminates on the thirtieth day after the filing of the subsequent case unless the debtor establishes a change in circumstances and a likelihood that the current bankruptcy will be successful. §362(c)(3)(A).  Mr. Sampson falls within this category of debtors.  In such instances, the Southern District of Georgia, like many districts, allows debtors to file a verified motion averring facts that show the current case has been filed in good faith and there has been a substantial change in circumstances sufficient for parties to conclude the subsequent case will be successful.  If a party in interest does not timely object to such a verified motion, an order extending the stay is entered. Office of Clerk, U.S. Bankr. Court, S.D. Ga., <u>Public Notice, Procedural Change:  Motions to Extend or Impose Stay</u> (Jan. 31, 2008), https://www.gasb.uscourts.gov/sites/gasb/files/PublicNotice_MotExtendStay.pdf.  In the Third Case, Mr. Sampson filed such a motion ("Motion to Extend").  Dckt. No. 6.  It is undisputed that Inglett never received notice of this motion and, therefore, did not have the opportunity to object to

---

[8]  Mr. Sampson failed to pay property taxes from 2018-2022.  Dckt. No. 86, Attach. A ¶32.

the extension of the stay. With no timely objection filed by any party in interest, the order extending the stay was entered. Third Case, Dckt. No. 17.

Revisiting the issue now, the Court notes Mr. Sampson's verified Motion to Extend and testimony at the various hearings indicate the Third Case was precipitated by Mr. Sampson's health issues and his attempt to save his property. His verified Motion to Extend indicates he was in better health and now capable of making his bankruptcy payments and direct mortgage payments. This is not an uncommon factual pattern faced by many repeat debtors, and given the specific facts of this case, the Court does not find, in retrospect, that this Third Case was filed in bad faith. Notwithstanding this finding, the Court also concludes that given the facts of this case, had Inglett received notice of the Third Case and filed an objection,[9] the stay would not have been extended as to the Property as the Court finds Mr. Sampson's overall conduct related to Inglett and the Property inequitable and would have accordingly excluded the Property from the extension of the stay.

Given the facts of this case, the Court finds the denial of the request for retroactive relief to annul the stay would result in unnecessary expense. Unwinding the sale to the disinterested Third Party would be difficult, at best, and would expose Inglett to multiple claims from the Third Party and others. Inglett, the Third Party, and others have detrimentally changed their respective positions on the basis of the validity of the foreclosure and sale. As the Eleventh Circuit has noted, annulments

---

[9] Section 362(c)(3)(B) provides that upon a proper showing, "the court may extend the stay in particular cases as to any or all creditors (<u>subject to such conditions or limitations as the court may then impose</u>) after notice and a hearing completed before the expiration of the 30-day period only if the party in interest demonstrates that the filing of the later case is in good faith as to the creditors to be stayed . . .". (emphasis added); <u>see also</u> §102(a) ("notice and hearing" does not always require an actual hearing).

12

AO 72A
(Rev. 8/82)

should be granted in rare and limited circumstances, and the Court certainly is not condoning creditors exercising self-help remedies after the imposition of the §362 stay. Mr. Sampson does not challenge the Court's authority to annul the stay, and given the particular facts of this case, the Court finds Inglett is entitled to an annulment of the stay and validation of the foreclosure sale.[10]

---

[10] The Court acknowledges the retroactive nature of the annulment of the stay and recognizes the U.S. Supreme Court's 2020 decision in Roman Catholic Archdiocese of San Juan, Puerto Rico v. Acevedo Feliciano, limiting the ability of federal courts to enter nunc pro tunc orders. 589 U.S. 57, 65 (2020). However, as noted in Chapter 13 Practice and Procedure:

> Although the ruling affects some aspects of bankruptcy practice, neither the holding nor the reasoning of Acevedo precludes an order that annuls the automatic stay to grant retroactive relief from it.
> . . . .
> An order annulling the automatic stay has the same effect as a nunc pro tunc order. It treats something in existence at an earlier time—the automatic stay—as if it did not exist, rendering it legally ineffective so that the act otherwise in violation of it is not void or voidable. Thus, for example, a postpetition foreclosure sale . . . that is otherwise void or voidable because of the automatic stay, becomes valid and effective upon annulment of the automatic stay.
>
> Although an annulment order operates retroactively like a nunc pro tunc order, Acevedo does not prohibit such relief because the context of an annulment order is materially different from the jurisdictional principles involved in Acevedo.
> . . . .
> The critical point is that Congress expressly authorized annulment of the stay. Acevedo dealt with the federal removal statute that contained no authority for the court in the removed matter to do anything until remand occurred or for the district court to grant retroactive relief in connection with remand. In contrast, Code §362(d) expressly authorizes the annulment of the automatic stay as one method of providing relief from it.

Drake, et al., Chapter 13 Practice & Procedure § 15:9 (June 2024); see also In re Patel, 642 B.R. 187 n.8 (Bankr. N.D. Ga. 2022), appeal docketed, No. 23-12847 (11th Cir. Aug. 28, 2023) ("The Court finds more persuasive the reasoning of In re Merriman, 616 B.R. 381, 393 (B.A.P. 9th Cir. 2020), appeal dismissed, 2021 WL 3610895 (9th Cir. Feb. 26, 2021) ('We do not interpret Acevedo as pertaining to the bankruptcy court's power to annul the automatic stay under §362(d) . . . The Merriman court reasoned that 'Congress' decision to deploy [the] four verbs [of §362(d)] to describe the various ways in which a bankruptcy court might grant relief from stay indicates an express

Turning to Mr. Sampson's request to hold Inglett in contempt for violating the stay and for damages, §362(k)(1) provides "an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." §362(k)(1). While any violation of the stay is prohibited under §362, damages are only awarded where the violation is "willful." In re White, 410 B.R. 322, 326 (Bankr. M.D. Fla. 2009). A willful violation of the stay "occurs when the creditor (1) knew the automatic stay was invoked and (2) intended the actions which violated the stay." Id.; Baker v. Sepich, No. 21-14145, 2022 WL 4594318, at *3 (11th Cir. Sept. 30, 2022) (per curiam) ("In order to properly plead her claim under 11 U.S.C. §362, [debtor] was required to allege several things, including that: the defendants knew of the existence of the bankruptcy stay, and that they acted intentionally after knowledge of the stay in a manner prohibited by § 362(a).") (citing In re Repine, 536 F.3d 512, 519 (5th Cir. 2008)); see also Jove Eng'g, Inc. v. I.R.S., 92 F.3d 1539, 1555 (11th Cir. 1996). Similarly, courts consider whether the violation is "willful" in finding contempt under §105, using the same elements of willfulness as under §362(k). Id. ("[S]tay violations [are] willful if the violator (1) knew of the automatic stay and (2) intentionally committed the violative act, regardless whether the violator specifically intended to violate the stay.") (internal citations

---

decision to grant bankruptcy courts the broadest possible range of options in respect of the stay, including annulling it, which has the effect of treating it as if it had never existed.' Merriman, 616 B.R. at 393. 'This result is perfectly consistent with the requirement that, in the performance of its 'traffic cop' role, bankruptcy courts must have broad authority to determine the appropriate forum for dispute resolution, taking into account and giving full respect to the panoply of interests to be weighed and protected in these matters, as well as to the dignity and power of other judicial processes.' Merriman, 616 B.R. at 394."); but see In re Telles, No. 8-20-70352-reg, 2020 WL 2121254 (Bankr. E.D.N.Y. Apr. 30, 2020) (in a judicial foreclosure state, the bankruptcy court held a nunc pro tunc order annulling the stay for judicial acts taken by a state court after the automatic stay was in effect was contrary to Acevedo).

14

AO 72A
(Rev. 8/82)

omitted). It is undisputed that Inglett did not have notice of the Third Case at the time of the foreclosure. Furthermore, after considering the evidence, the Court finds Inglett did not have notice of the Third Case when it sold the property to the Third Party. Thus, the Court concludes Inglett did not willfully violate the automatic stay, and a finding of contempt and the imposition of damages is inappropriate. For these reasons, the Court finds Mr. Sampson is not entitled to stay violation damages, and Mr. Sampson's requests to unwind the sale and hold Inglett in contempt for violation of the stay are denied.

FOR THESE REASONS, AND THE REASONS SET FORTH ON THE RECORD AT THE CONCLUSION OF THE TRIAL, IT IS ORDERED:

1. Mr. Sampson's request to hold Inglett in contempt for violation of the §362 stay is DENIED;
2. Mr. Sampson's requests to unwind the sale and for actual and punitive damages are DENIED;
3. Inglett's motion to annul the stay as to the Property is GRANTED;
4. Inglett's motion to validate the foreclosure sale on the Property is GRANTED; and
5. The Clerk's Office is directed to set a hearing in the Third Case on the status of Inglett's claim and its motion to file a late deficiency claim.[11]

**[END OF DOCUMENT]**

---

[11] On the record after the conclusion of trial, the Court reserved ruling on Inglett's motion for relief to file a late deficiency claim. Subsequently, Inglett has filed an amended claim in the Third Case for the deficiency amount. Third Case, Claim No. 8-2.